UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
ARQUIS BOWENS,

                              Plaintiff,                    **R E P O R T    A N D**
                                                           **RECOMMENDATION**
          - against -
                                                           06 CV 809 (NG)
ATLANTIC MAINTENANCE CORP.,

                              Defendant.
-------------------------------------------------------X

On February 24, 2006, Luis Marti ("Marti"), individually and on behalf of all other

persons similarly situated, commenced an action against defendant Atlantic Maintenance Corp.

("Atlantic") pursuant to the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"),

seeking unpaid wages for overtime work under the New York Labor Law, reimbursement for

deductions improperly made by defendant from wages, and liquidated damages. Plaintiff Arquis

D. Bowens ("Bowens") initially filed a consent to join the action on July 17, 2006. On

November 16, 2006, this Court issued a Report and Recommendation, recommending that Mr.

Marti's claim be dismissed based on his voluntary withdrawal from the action.

Thereafter, on December 1, 2006, plaintiff Bowens filed a Second Amended Verified

Complaint and Jury Demand, seeking to represent a class of non-exempt employees of defendant

who provided janitorial and maintenance services and who did not receive overtime

compensation or who had improper deductions made from their wages. (Am. Compl.[1] ¶ 8).

---

[1]Citations to "Am. Compl." refer to the Second Amended Verified Complaint and Jury
Demand, filed by plaintiff Bowens on December 1, 2006. The Amended Complaint seeks unpaid
wages under the New Jersey Wage and Hour Act instead of under the New York Labor Law. Id.
¶ 2).

Currently pending before this Court are 1) plaintiffs' motion for contempt and to disqualify defendant's counsel;[2] 2) defendant's motion to dismiss; 3) plaintiffs' motion for certification of this case as a collective action; 4) defendant's motion for disqualification of plaintiffs' counsel, which includes a motion to compel plaintiff Bowens to testify about his decision to remain in the case; and 5) plaintiffs' motion to prevent defendant from communicating with anyone involved in the case.

## FACTUAL AND PROCEDURAL BACKGROUND

According to the initial Complaint filed by former plaintiff Luis Marti, defendant Atlantic is a New York corporation with its principal place of business located in Brooklyn, New York, which provides janitorial and maintenance services to various clients. (Compl.[3] ¶¶ 7, 22). Marti alleged that he was an employee of Atlantic who worked as a field supervisor for the defendant from approximately February 2005 until December 2005. (Id. ¶ 23). According to the Marti Complaint, Marti often worked in excess of 40 hours per week, and yet defendant did not pay overtime compensation of one and one-half times the regular hourly rate; further, defendant took improper deductions from plaintiff's wages, all in violation of the FLSA, New York Labor Law and New York State Department of Labor regulations. (Id. ¶ 25). Marti further alleged that, despite his title and position, he was a non-exempt employee with no managerial responsibilities

---

[2]That portion of plaintiffs' motion in which they sought to disqualify defendants' counsel was withdrawn during the hearing before this Court on April 27, 2007, and thus has not been addressed herein.

[3]Citations to "Compl." refer to plaintiff Marti's initial Complaint, filed on February 24, 2006.

or authority.  (Id. ¶¶ 23, 25).

Plaintiffs further alleged that defendant employed other individuals in positions that required little skill and no capital investment and who had no managerial duties or responsibilities.  (Id. ¶ 26).  Like plaintiff Marti, it was alleged that these non-exempt individuals worked in excess of 40 hours a week and yet were not paid the requisite overtime compensation and also had improper deductions taken from their wages.  (Id. ¶ 27).  Plaintiffs further alleged that although the exact number of employees was unknown, it was estimated that there were approximately 200 prospective members of the class, most of whom would be unable to afford to bring their own individual action.  (Id. ¶ 9).

Following the commencement of the action by Marti, a number of additional employees of Atlantic filed consents to become parties in the action.  Consents were filed by Michael Craig on March 27, 2006; by Jason Edwards on June 6, 2006; and by Anthony Carter and Dwelon Edwards, along with Mr. Bowens, on July 17, 2006.  A stipulation extending the defendant's time to answer was entered into by the parties on September 27, 2006 and thereafter, before any answer was filed, counsel for Atlantic submitted a letter to the Court transmitting a copy of a letter addressed to the Court from Marti.  In this letter, dated November 6, 2006, Marti requested an adjournment of the initial conference set by the Court and indicated that he wished to withdraw his case against Atlantic based on a settlement entered into with the company through the Wage and Hour Office in Trenton, N.J.

Based on the letter from Mr. Marti, this Court then issued a recommendation, dated November 15, 2006, that his claims be dismissed.  On November 20, 2006, the Court held a conference at which time Marti's former counsel represented that there were other potential class

3

members who wished to proceed with the case. Accordingly, the Court, rather than recommending dismissal of the entire action, granted counsel time to file an amended verified complaint with new plaintiffs or to notify the court that they were willing to dismiss the case. (Minute Entry dated November 20, 2006).

Following the conference, this Court received a letter dated November 30, 2006, from plaintiffs' counsel, requesting an "emergency in-person conference for a protective order prohibiting Defendant Atlantic Maintenance Corp., and its officers, agents and employees from directly contacting the named Plaintiffs and class members, including but not limited to Messrs. Marti and Craig, for the purpose of threatening or buying off class representatives or for the purpose of discussing the allegations made in this case without the involvement of Plaintiffs' counsel and the Court." (Pls.' Nov. 30, 2006 Letter at 1). In their letter, plaintiffs' counsel indicated that they had become aware of two class members who, "[a]lmost immediately after retaining counsel and approving the filing of court papers," withdrew from the case by faxing letters discharging plaintiffs' counsel. (Id.) Counsel's letter went on to further assert that after Marti withdrew from the case, Michael Craig retained plaintiffs' counsel, who then moved on November 27, 2006 to substitute Craig for Marti. (Id.) Two days later, on November 29, 2006, Mr. Craig sent a letter seeking to discharge plaintiffs' counsel. (Id., Ex. B). Although plaintiffs' counsel refrained from directly accusing defendant and its principals of making threats or improper settlement offers to the class members without conferring with their counsel, plaintiffs' counsel felt that the conduct was such that an inquiry into defendant's conduct should be held along with the issuance of an order prohibiting defendant from negotiating with the named plaintiffs and other absent class members. (Id. at 3).

4

Based on the plaintiffs' counsel's representations, this Court, at a status conference held on December 6, 2006, issued a temporary Order. In that Order, the Court directed the parties to brief plaintiffs' motion for a protective order and Ordered as follows: "Defendant agree[s] not to discuss litigation with putative class members in [interim.]" (Minute Entry dated December 6, 2006). Defendant's counsel, Israel Kornstein, Esq., and Atlantic's principals, Patrick DeSimone and David Goldberg, were present at that conference as well as at the January 30, 2007 conference at which the Court ordered that the temporary order was to remain in place as to both parties. (Minute Entry dated January 30, 2007).

## DISCUSSION

### A. THE CONTEMPT MOTION

By letter dated February 17, 2007, plaintiffs move for an order of contempt based on defendant's alleged violation of this Court's Order of December 6, 2006. (Pls.' Feb. 17, 2007 Letter at 1). Plaintiffs contend that DeSimone and Goldberg improperly directed one of their employees to offer money to plaintiff Bowens "to drop this case and discharge his attorneys." (Id. at 2).

### 1. Standards for Contempt

It is well established that "'[t]he power to punish for contempts is inherent in all courts.'" Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) (quoting Ex parte Robinson, 19 Wall. 505, 510 (1873)); see also People v. Terry, 45 F.3d 17, 23 (2d Cir. 1995). The underlying concern is "'disobedience to the orders of the [j]udiciary,'" not "'merely the disruption of court proceedings.'" Chambers v. NASCO, Inc., 501 U.S. at 44 (quoting Young v. United States, 481

U.S. 787, 798 (1987)); see also People v. Terry, 45 F.3d at 23 (noting that the power of contempt

is "'governed not by rule or statute but by the control necessarily vested in courts to manage their

own affairs so as to achieve the orderly and expeditious disposition of cases'") (quoting

Chambers v. NASCO, Inc., 501 U.S. at 43 (internal quotations omitted)); United States v. D-M

Sales Corp., 903 F. Supp. 431, 433 (E.D.N.Y. 1995). Thus, an individual who fails to obey a

valid order of the court may be subject to both civil and criminal penalties for his actions. See

United States v. Petito, 671 F.2d 68, 72 (2d Cir.) (citing Yates v. United States, 355 U.S. 66, 74

(1957)), cert. denied, 459 U.S. 824 (1982). The primary difference between orders of civil and

criminal contempt is their purpose. Criminal contempt is used to punish the contemnor or

vindicate the court's authority; civil contempt seeks to coerce the contemnor into compliance

with the court's order or to compensate the complaining party for losses incurred as a result of

the contemnor's conduct. See Hess v. New Jersey Transit Rail Operations, Inc., 846 F.2d 114,

115 (2d Cir. 1988); In re Grand Jury Witness, 835 F.2d 437, 440-41 (2d Cir. 1987), cert. denied,

485 U.S. 1039 (1988); In re Weiss, 703 F.2d 653, 661 (2d Cir. 1983); New York State Nat'l Org.

for Women v. Terry, 697 F. Supp. 1324, 1329 (S.D.N.Y. 1988).

An order of civil contempt may issue pursuant to Title 18, United States Code, Section

401, which authorizes a federal court to punish "by fine or imprisonment, or both, at its

discretion" any contempt of the court's authority, such as "[m]isbehavior of any person in [the

court's] presence or so near thereto as to obstruct the administration of justice" or

"[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18

U.S.C. § 401 (2002). The court also "has the inherent power to hold a party in civil contempt in

order 'to enforce compliance with an order of the court or to compensate for losses or damages.'"

Powell v. Ward, 643 F.2d 924, 931 (2d Cir.) (quoting McComb v. Jacksonville Paper Co., 336 U.S. 187, 191 (1949)), cert. denied, 454 U.S. 832 (1981); see also Vuitton et Fils S.A. v. Carousel Handbags, 592 F.2d 126, 130 (2d Cir. 1979); United States v. D-M Sales Corp., 903 F. Supp. at 433; New York State Nat'l Org. For Women v. Terry, 697 F. Supp. at 1329.

There are three essential elements which must be established before a party can be held in civil contempt: 1) there must be an order that is "clear and unambiguous," Powell v. Ward, 643 F.2d at 931 (citing International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 75-76 (1967)); 2) the proof of non-compliance with that order must be "'clear and convincing,'" id. (quoting NLRB v. Local 282, 428 F.2d 994, 1001-02 (2d Cir. 1970)); and 3) it must be shown that the contemnor has not "'been reasonably diligent and energetic in attempting to accomplish what was ordered.'" Id. (quoting Aspira of New York, Inc. v. Bd. of Educ., 423 F. Supp. 647, 654 (S.D.N.Y. 1976)). See also King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995) (holding that "[a] contempt order is warranted only where the moving party establishes by clear and convincing evidence that the alleged contemnor violated the district court's edict"); United States v. D-M Sales Corp., 903 F. Supp. at 433.[4]

The court's order must leave "'no uncertainty in the minds of those to whom it is addressed,'" and one "'must be able to ascertain from the four corners of the order precisely what acts are forbidden.'" King v. Allied Vision, Ltd., 65 F.3d at 1058 (citations omitted). Moreover, in determining whether civil contempt sanctions should be imposed for the purpose of making a contemnor comply with an order, the Supreme Court has set forth several factors for the courts to

---

[4]Since the order sought here is one for civil and not criminal contempt, there is no requirement that the court find willfulness on the part of the contemnor. See Canterbury Belts Ltd. v. Lane Walker Rudkin, Ltd., 869 F.2d 34, 39 (2d Cir. 1989).

consider: "(1) the character and magnitude of the harm threatened by continued contempt, (2) the probable effectiveness of the proposed sanction, and (3) the financial consequence of that sanction upon the contemnor." In re Grand Jury Witness, 835 F.2d at 443 (citing United States v. United Mine Workers of Am., 330 U.S. 258, 304 (1947)). Since a contempt order is a "potent weapon," International Longshoremen's Ass'n v. Philadelphia Marine Trade Ass'n, 389 U.S. at 76, courts should be cautious in imposing this sanction if "'there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" King v. Allied Vision, Ltd., 65 F.3d at 1058 (quoting California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618 (1885)).

### 2. The Contempt Hearing

#### a. Bowens's Testimony

On March 12, 2007, plaintiff Arquis Bowens testified that on or about November 20, 2006, he was contacted by his former brother-in-law Leslie Johnson, a supervisor for defendant Atlantic. (Mar. 12 Tr.[5] at 7, 10). He then went to the office of defendant, where he met with Patrick DeSimone, one of defendant's principals, and another individual whose name he could not recall. (Id. at 7). They offered to give him back his job if he signed an affidavit. (Id.) He told them he would get back to them but he first wanted to consult someone; he then contacted Jeffrey Gottlieb, one of his current attorneys. (Id. at 7-8). Mr. Bowens also testified that on or about December 1, 2006, he signed a declaration reciting what had occurred in the Atlantic offices on or about November 20, 2006. (Id. at 9-10; Pls.' Ex.[6] 1 (Declaration of Arquis Bowens,

---

[5] Citations to "Mar. 12 Tr." refer to the transcript of proceedings held before this Court on March 12, 2007.

[6] Citations to "Pls.' Ex." or "Def.'s Ex." refer to the Exhibits admitted into evidence during the proceedings before this Court on March 12 and March 15, 2007.

dated December 1, 2006)).

Bowens testified that thereafter, in February 2007, Leslie Johnson approached Bowens and indicated that Atlantic was willing to pay Bowens $700 if he would drop out of the lawsuit. (Id. at 10). Bowens told Johnson that he was out of work but was not willing to drop the case for $700 because he felt that the company owed him more than that. (Id.) Mr. Bowens identified a Declaration that he signed on February 11, 2007 reflecting what had transpired between Bowens and Johnson on February 8, 2007. (Id. at 13; Pls.' Ex. 2 (Declaration of Arquis Bowens, dated February 11, 2007)).

On or about February 15, 2007, Johnson contacted Bowens again and told him that defendant had "upped the price from $700 to $1,500." (Id. at 13). Bowens, who needed the money, told Johnson to contact the defendant and indicate Bowens's willingness to accept the offer of $1,500. (Id. at 14). Johnson told Bowens that if he was willing to drop the case, he should go to the office of defendant on February 16, 2007. (Id.) Bowens denied that he had done anything to contact Johnson; he claimed that it was Johnson who had approached Bowens. (Id.)

On February 16, 2007, at 8:00 a.m., Bowens reported to Atlantic's office to receive his $1,500 payment. (Id.) Mr. Goldberg met Bowens in the office and told Bowens to contact his counsel first and tell them that he was dropping out of the case. (Id.) Since Bowens was unable to get in touch with any of the attorneys, he left and "was at a standstill for a while." (Id. at 15). Bowens testified that Johnson contacted him again and told Bowens to contact Goldberg, who gave Bowens the fax number for Brian Bromberg, another of Bowens's attorneys. (Id. at 15-16).

Bowens brought a letter[7] to the office at 4:00 that evening, where Goldberg watched Bowens sign his name. (Id. at 16). Bowens brought a copy of the letter he had faxed to Bromberg's office earlier that day to Atlantic, and a second copy of the letter was mailed to the court by Mr. Goldberg. (Id. at 15-16, 40). After Bowens sealed the envelope, Goldberg handed Bowens $1,500 in cash. (Id. at 16). Out of the $1,500 he had received, Bowens gave $200 to Mr. Johnson. (Id. at 17).

According to Bowens, he then went "down south" and only returned in order to attend the court hearing on March 12, 2007. (Id. at 17). He testified that on Saturday, March 10, 2007, Mr. Johnson approached him "kind of upset and angry . . . trying to convince [Bowens] not to go to court." (Id.) He accused Bowens of using him to get money from defendant, to which Bowens responded, "No. . . . They used me. I didn't use you." (Id.) Bowens then told him that if Atlantic really did not want him to come to court, they could pay him $600. (Id.) According to Bowens, he was approached by Johnson before he left for court that morning. (Id.) Johnson indicated that Atlantic was willing to pay the $600 but only after 5:00 that afternoon after it was clear he had not come to court. (Id. at 17-18).

When asked if he wanted to continue as a plaintiff in the case, Mr. Bowens testified, "I mean, yes, I feel like that, you know, I was robbed out of my money. I worked hard for that company and then I feel that yeah, they owe me – I accepted money from them, yes, but I feel that I was fired after I signed on to this lawsuit . . . ." (Id. at 18-19). He explained that he signed on to the lawsuit on July 13, 2006 (see Pls.' Ex. 3 (Bowens's Notice of Consent)), and then the

---

[7]This letter, which was subsequently admitted into evidence as defendant's Exhibit B, is from Mr. Bowens to Mr. Bromberg and indicates Bowens's desire to "resign off the case." (Def.'s Ex. B).

company hired an individual named Greg Mayo to "weed" out and fire all of the employees of Atlantic who had joined the lawsuit. (Id. at 19). Indeed, Bowens was fired in September 2006. (Id.) Bowens testified that he could discern no other basis on which he was fired. He had worked for eight months when one day, his shirt was untucked at work and Mr. DeSimone "screamed" at him, "'Tuck in your shirt'" and then tried to give Bowens a day suspension. (Id. at 21-22). Bowens indicated that Mr. DeSimone's behavior demonstrated that "he knew that I was on the lawsuit." (Id. at 22).

On cross-examination, counsel for defendant noted that in his Declaration documenting the events of November 2006, submitted as Plaintiffs' Exhibit 1, Bowens stated that he had received a telephone call from DeSimone, not that he was contacted by Johnson, as he had testified during the hearing. (Id. at 23). Bowens explained that the statement in the Declaration was a mistake because at around that time, he did have a meeting with DeSimone, but he conceded that he had not received a phone call from DeSimone. (Id.) When asked when he first saw the Declaration, Bowens testified that it was either on the 20th or 21st of November, 2006. (Id. at 25). The document, however, contains a date of December 1, 2006 and when shown the document, Mr. Bowens changed his testimony to indicate that that was actually the date that he signed the document. (Id. at 26-27).

Mr. Bowens confirmed on cross-examination that he had been offered $700 and $1,500 to withdraw from the case. (Id. at 28). He also acknowledged that he had been informed of an offer of "$700 . . . something dollars. But I turned the offer down." (Id. at 29). He indicated that the offer, which counsel for defendant indicated was an offer of judgment made pursuant to Rule 68 of the Federal Rules of Civil Procedure, was conveyed by Johnson and not by Bowens's

attorneys. (Id. at 29-30). He testified that at different times, Johnson told him he was being offered both $700 and $772. (Id. at 30). He also clarified his earlier testimony that although he knew that some of the other opt-in plaintiffs had been fired, he did not know their specific employment histories. (Id. at 35).

### b. Goldberg's Testimony

David Goldberg, one of the principals of Atlantic, testified that Bowens was employed by Atlantic from January or February 2006 to August 2006. (Mar. 15 Tr.[8] at 7). According to Goldberg, Bowens "basically quit" in August 2006 after he objected to having been assigned to work in a particular area of Jersey City, New Jersey. (Id.) His supervisor called Bowens at home to try to reconcile the situation, but Bowens refused to go back to work. (Id. at 7-8).

Goldberg testified that the next time he saw Bowens was on November 22, 2006 when Bowens appeared at Atlantic's Journal Square location[9] looking for a job. (Id. at 8). At that time, Goldberg admitted speaking to Bowens about the case and told him that Marti was no longer part of the case. (Id. at 8). Goldberg asked Bowens if he would be interested in resigning as an opt-in plaintiff. (Id.) Bowens responded by asking, "'What's in it for me,'" to which Goldberg responded, "'Nothing.'" (Id.) Goldberg told Bowens that he had reviewed Bowens's pay stubs and payroll records and that Atlantic owed Bowens nothing. (Id.) Bowens indicated that if he was "going to put [his] pen to the paper [he would have] to get something for it." (Id.) Goldberg told Bowens that he would take it into consideration but upon discussing it with

---

[8]Citations to "Mar. 15 Tr. " refer to the transcript of proceedings held before this Court on March 15, 2007.

[9]According to Goldberg, Atlantic's main office is located in Brooklyn; the Journal Square location is a satellite office from which the company operates a particular job site. (Id. at 11).

DeSimone, they decided that "he was a terrible employee; he was never really following directions." (Id. at 8-9).

The next time Goldberg spoke to Bowens was on February 15, 2007 at the Journal Square office, when Bowens came in looking for his W-2 form. (Id.) Goldberg did not understand why Bowens did not simply contact the secretary in the main office in Brooklyn. (Id.) Goldberg had Mark Schuyler, an operations manager, call the Brooklyn office for Bowens and he confirmed that the W-2 would be mailed to Bowens that day. (Id. at 9-10). Goldberg testified that Bowens then told him that he really did not want to be part of the case. (Id. at 10). Goldberg responded that he had been instructed not to speak to Bowens about the case and testified that Bowens "actually thanked [Goldberg]" for hiring him. (Id.)

Goldberg testified that on February 16, 2007, Bowens came to the Journal Square office again and mentioned that he had reviewed the W-2 form and thought there was something wrong with the federal withholding. (Id. at 11). He mentioned again that he wanted out of the case and that he had attempted to call his attorneys but they had not returned his phone call. (Id.) He told Goldberg that he was moving south and that he did not want to be part of the case. (Id.) Goldberg reiterated the fact that he could not speak about the case, but he gave Bowens the fax number for Bowens's lawyer and the Court's address. (Id. at 11-12).

Goldberg denied having any contact with Bowens as alleged in Bowens's December 1, 2006 affidavit, except he conceded that he was present for the November 22, 2006 meeting at which DeSimone was also present. (Id. at 15-16). He also denied Bowens's claim that at the meeting, DeSimone and Goldberg offered to give Bowens back his job if he signed an affidavit agreeing to drop his claim. (Id. at 20). Goldberg also denied telling Leslie Johnson to speak to

13

Bowens about the case (id. at 24), and he testified that both he and DeSimone made the decision that they would not contact former company employees. (Id. at 19). Mr. Goldberg also explained that it would make no sense for Johnson to offer Bowens $700 as Bowens claimed at that time because the company had, as of January 9, 2007, already made the Rule 68 Offer for $772.00. (Id. at 25-26; Def.'s Ex. A (Rule 68 Offer of Judgment)).

On cross-examination, Bowens's counsel confirmed that Goldberg and DeSimone were present in court on December 6, 2006 when this Court issued the order that neither of Atlantic's principals or its employees were to communicate with any employees or former employees about this case. (Id. at 26-27). Goldberg denied sending Johnson to visit Bowens and denied making any payment to Bowens apart from his salary. (Id. at 51-52). Goldberg also acknowledged that on or about January 31, 2007, he had received the Court's Order of January 30, 2007 extending the temporary Order of December 6, 2006. (Id. at 28-29; Pls.' Ex. 4 (Email with Minute Entry of January 30, 2007 attached)). He testified that he believed that DeSimone also saw the Order and both were aware that they were not to speak about the case. (Id. at 29). He denied speaking to any employees or former employees about the lawsuit even prior to the Court's December 6, 2006 Order (id. at 30-31), and he did not recall ever speaking to Johnson about the case. (Id. at 31).

With respect to Marti, Goldberg testified that he had stopped working for Atlantic in December 2005 and Goldberg denied paying him any money to drop the case. (Id. at 32). Goldberg denied that he spoke to Marti about the case, except that during a separate court proceeding in Trenton, Marti expressed to Goldberg that he was glad he had worked for Atlantic and that the case was resolved for him. (Id.)

14

Plaintiffs submitted four letters from Marti, Michael Craig, Jason Edwards and Dwelon Edwards discharging plaintiffs' attorneys, and asked Goldberg if Atlantic had paid any of them to withdraw from the lawsuit or discharge their attorneys. (Id. at 43-47; Pls.' Exs. 5, 6, 7, 8 (Letters of discharge from Luis Marti, Michael Craig, Jason Edwards and Dwelon Edwards, respectively)). Goldberg not only denied paying them any money, he also denied having any conversation with them regarding the lawsuit. (Id. at 48-49). Goldberg denied preparing the letters[10] and denied having any knowledge as to who composed the language in the letters. (Id. at 49-50).

When shown Defendant's Exhibit C, a copy of the letter sent by Bowens to the Court indicating his desire to resign from the case, Goldberg testified that the first time he saw that letter was when it was shown to him by Atlantic's attorney. (Id. at 57-58). He denied that he suggested the language and explained that he gave Mr. Bromberg's fax number to Bowens because Bowens had complained that he was unable to get in touch with his attorneys. (Id. at 58). The witness denied any knowledge as to who mailed a copy of the letter to the Court, and he denied offering Bowens $600 in exchange for not appearing to testify in Court. (Id. at 59). In denying that there was a payment of $1,500 in cash to Bowens, Goldberg explained that the only people in the company with access to the company's money are Goldberg and DeSimone. (Id. at 60).

---

[10]The letters from Craig and Jason and Dwelon Edwards are virtually identical. They are addressed to "To whom it may concern" and state: "I do not want to be a plaintiff in the Marti v Atlantic Maintenance lawsuit. I don't want to be involved in that lawsuit in any other way, and I revoke the notice of consent that I signed." (Id. at 49; see also Pls.' Exs. 6-8).

### c. DeSimone's Testimony

Patrick DeSimone, the other principal of Atlantic, testified that the first time he spoke to Bowens after he left Atlantic's employ was November 22, 2006. (Id. at 63). He denied calling Bowens on November 20, 2006 or at any other time thereafter. (Id. at 64-65). He also denied telling Bowens that the case was going nowhere because Marti had settled. (Id.) He denied being asked if the company would pay Bowens for all hours previously worked. (Id. at 66). He did acknowledge telling Bowens that Atlantic did not owe him any money (id.), but denied telling Bowens that unless he dropped the lawsuit, Atlantic would not re-hire him. (Id. at 67). He denied making an appointment to meet with Bowens on December 4, 2006 and he indicated that he did not believe that Johnson had a conversation with Bowens on February 8, 2007. (Id. at 68-69). He also denied having any conversation with Johnson about contacting Bowens (id. at 70-71), testifying that he never talked to Johnson about the case. (Id. at 86-87).

According to DeSimone, he never "[a]t any time" discussed the case with Mr. Craig or either of the Edwards and he was not aware that any monies were paid to them to drop the case. (Id. at 72-73). He stated that he played no role in preparing and had no knowledge as to who prepared the letters submitted by the various employees seeking to withdraw from the case but he did acknowledge that Exhibits 7 and 8, the letters from Jason and Dwelon Edwards, were faxed from Atlantic's Brooklyn office. (Id. at 74-75). He testified that only he, Goldberg, and the office manager, Sandra Batts, are authorized to use the fax machine, but acknowledged that "other people . . . have access to our office." (Id. at 76-77).

DeSimone acknowledged being aware of the Court's December 6, 2006 Order and he conceded that he received the January 30, 2007 Order extending the terms of the December 6

Order as well. (Id. at 81-83). He understood that he was not to discuss the case with any employees or former employees and he had no knowledge as to whether anyone asked Johnson to speak to Bowens. (Id. at 83-84). He flatly denied offering Bowens money not to appear (id. at 84), and he denied making any threats to get any of the other individuals to drop the case. (Id. at 85-86).

### d. Johnson's Testimony

Leslie Johnson, the final witness to appear at the hearing, testified that he is a supervisor for Atlantic assigned to the Journal Square office. (Id. at 92). He testified that he knows Bowens because he used to date Bowens's sister and got Bowens the job at Atlantic. (Id.) He found out in late November 2006 that Bowens was involved in the lawsuit because Bowens came to the office and asked Johnson if he could get his job back. (Id. at 93). According to Johnson, Bowens then spoke to DeSimone and Goldberg, but Johnson was not present during the conversation. (Id. at 93-94). Johnson denied having any knowledge regarding the statements in Bowens's declaration, denied ever speaking with Bowens about the lawsuit and denied being asked to talk to Bowens about the case. (Id. at 94-95).

He further denied the truth of Bowens's assertions in the February 11, 2007 Declaration, including the claims that he made offers of money to get Bowens to drop the case. (Id. at 96-97). He did admit to speaking to Bowens on February 8, 2007 when Bowens asked Johnson why he had not yet received his W-2 form, but Johnson simply told him to contact the main office in Brooklyn. (Id. at 97-98). About a week later, Bowens came back to the office, again inquiring about his W-2, and he spoke to Goldberg at that time. (Id. at 98). Johnson testified that he was told by Goldberg and DeSimone not to speak to any of the employees about the lawsuit (id.), and

17

that he had never had any conversations with either of them about the case. (Id. at 107).

On cross-examination, Johnson denied that he went to Bowens's house on March 10, 2007 to convince him not to testify. (Id. at 99).[11] After further reflection, however, Johnson conceded that he had spoken with Bowens that evening, on a corner near Bowens's home. (Id. at 102, 109). According to Johnson, Bowens and Bowens's mother drove past Johnson on their way home and Bowens then joined Johnson on the corner. (Id. at 102). He asked Johnson to share some of the beverage that Johnson was drinking and then, without further conversation, took the bottle back to his house. (Id. at 103).

Johnson spoke to Bowens again in the evening of March 12, 2007, at the same location, after Bowens had already testified. (Id.) According to Johnson, Bowens informed him that Johnson would probably have to go to court because his name kept coming up. (Id.) Johnson, however, denied offering Bowens any money not to testify and denied speaking to him earlier in the day. (Id. at 103-04). He denied offering him any money at all related to the case and he denied paying Bowens $1,500. (Id. at 104-06). He also denied discussing the case with any of the other opt-in employees or with Goldberg or DeSimone. (Id. at 107, 109).

At the conclusion of the testimony, counsel for defendant noted that Bowens had never mentioned a conversation with Johnson at which his mother was present and therefore, before

---

[11]Bowens's attorney proceeded to question Mr. Johnson about the front door of Bowens's house. Johnson testified that there are stairs leading to the front door, which consists of a screen door with a solid door behind it. (Id. at 99-100). Johnson admitted that if Clara Bowens, Bowens's mother, had been standing behind the screen door, she would have been able to hear any conversations taking place in front of the house. (Id. at 100). Counsel then indicated his intent to have Ms. Bowens testify about conversations between Arquis Bowens and Johnson, presumably at or outside the Bowens residence. (Id. at 100-01).

Bowens's mother testified, he requested that Bowens be brought back to court for further questioning. (Id. at 117). Counsel also moved to inquire as to what, if anything, was said between Bowens and his counsel such that Bowens changed his mind and decided to remain in the case after seeking to withdraw, a line of questioning that the Court precluded on grounds of privilege. (Id. at 119-20). The Court urged defendant's counsel that if he wish to pursue this line of questioning, he should submit case-law authority for breaching the attorney-client privilege in these circumstances. (Id. at 120).

### 3. Attorney-Client Privilege Dispute

By letter dated March 30, 2007, defendant moves for an Order to compel the testimony of plaintiff Bowens on the subject of his change of opinion regarding his inclusion as a plaintiff in this case. (Def.'s March 30, 2007 Letter at 1-2). Specifically, defendant seeks information about any conversations between Bowens and his attorneys between February 16, 2007, when plaintiff sent his letter indicating his desire to resign from the case, and March 12, 2007, when plaintiff testified before this Court that he still wishes to be a plaintiff in the case. (Id. at 2). Defendant contends that "Bowens has been pressured by one or more of his three law firms to continue in a litigation from which he wants 'to resign.'" (Id.)

In support of its request, defendant argues that actions under the FLSA have become "'cash cows'" for plaintiffs' attorneys, and that these attorneys therefore have an interest in rejecting settlement offers so that they can recover fees and costs. (Id. at 2-3). Defendant alleges that the failure of Bowens's attorneys' to communicate defendant's Rule 68 offer is an indication of their improper desire to extend this litigation against Bowens's wishes. (Id. at 3). Defendant requests documents and all information relating to the fee arrangement between Bowens and his

counsel, arguing that such information is not privileged. (Id. at 4).

At the hearing before this Court on April 27, 2007, defendant requested the disclosure of the retainer agreement between plaintiff Arquis Bowens and his counsel. (Apr. 27 Tr.[12] at 14, 16). Defendant again asserted that the agreement could be relevant to its argument that Mr. Bowens's counsel did not convey a settlement offer made by defendants. (Id. at 16). The Court agreed to review the document in camera to assess whether it was relevant to the present proceedings (id. at 17), and Bowens's counsel submitted the agreement under hard copy, attached to a letter dated May 1, 2007.

Having carefully reviewed the document, which appears to be a standard retention agreement, the Court finds that it does not relate to the present proceeding. Plaintiffs' counsel have already admitted during the hearing before this Court that they are to be paid on a contingency basis, and the document is unnecessary to defendant's argument on the offer of settlement. Given the irrelevance of this retention agreement, and that it raises privilege concerns, this Court declines to make it available to defendant, and accordingly Orders it to be filed under seal.[13]

### 4. Magistrate Judge's Authority

Under the Federal Magistrates Act, 28 U.S.C. § 636(e), federal magistrate judges are authorized to exercise contempt authority in certain limited circumstances. These include

---

[12]Citations to "Apr. 27 Tr." refer to the transcript of proceedings held before this Court on April 27, 2007.

[13]The Court notes that Mr. Bowens's signature in the agreement appears to be somewhat different from the other signatures on other documents. However, the Court is comparing handwriting with an untrained eye and does not find that this discrepancy requires disclosure of the agreement.

summary criminal contempt authority, which may be imposed by the magistrate judge for misbehavior "in the magistrate judge's presence so as to obstruct the administration of justice," 28 U.S.C. § 636(e)(2), as well as criminal contempt and civil contempt authority in misdemeanor cases and cases where the magistrate judge presides with the consent of the parties. 28 U.S.C. §§ 636(e)(3), (4). In all other instances where a person has committed an act constituting a contempt in a proceeding before the magistrate judge, the Act sets forth a certification procedure whereby:

> the magistrate judge shall forthwith certify the facts to a district judge and may serve or cause to be served, upon any person whose behavior is brought into question under this paragraph, an order requiring such person to appear before a district judge upon a day certain to show cause why that person should not be adjudged in contempt by reason of the facts so certified. The district judge shall thereupon hear the evidence as to the act or conduct complained of and, if it is such as to warrant punishment, punish such person in the same manner and to the same extent as for a contempt committed before a district judge.

28 U.S.C. § 636(e)(6)(B)(iii).

Under the certification process, the magistrate judge may conduct a hearing, see, e.g., Church v. Steller, 35 F. Supp. 2d 215, 217 (N.D.N.Y. 1999); British Int'l Ins. Co. v. Seguros La Republica, S.A., No. 90 CV 2370, 2001 WL 958975, at *7 (S.D.N.Y. Aug. 22, 2001), but the magistrate judge "functions only to 'certify the facts'" and not to issue an order of contempt. Church v. Steller, 35 F. Supp. 2d at 217 (citing Litton Sys., Inc. v. AT&T, 700 F.2d 785, 827 (2d Cir. 1983), cert. denied, 464 U.S. 1073 (1984)); see also Stein Indus., Inc. v. Jarco Indus., Inc., 33 F. Supp. 2d 163, 165-66 (E.D.N.Y. 1999); Gomez v. Scoma's, Inc., No. C-94-4452, 1996 WL 723082, at *3 (N.D. Cal. 1996) (holding that a magistrate judge's duty "is simply to investigate whether further contempt proceedings are warranted, not to issue a contempt order"). In

certifying the facts under Section 636(e), the magistrate judge's role is "to determine whether the moving party can adduce sufficient evidence to establish a prima facie case of contempt." Church v. Steller, 35 F. Supp. 2d at 217 (citing Proctor v. State Gov't of N.C., 830 F.2d 514, 521 (4th Cir. 1987)).

The district court, upon certification of the facts supporting a finding of contempt, is then required to conduct a de novo hearing at which issues of fact and credibility determinations are to be made. See Taberer v. Armstrong World Indus., Inc., 954 F.2d 888, 907-08 (3d Cir. 1992) (holding that it was error for the district court not to conduct a de novo hearing after the magistrate judge issued a certification of contempt). Where, however, the magistrate judge declines to certify the conduct to the district court for a determination of contempt, the "district court may not proceed further on a motion for contempt where the conduct at issue occurred before a magistrate judge." Church v. Steller, 35 F. Supp. 2d at 217 (citing In re Nova Biomedical Corp. v. i-STAT Corp., 182 F.R.D. 419, 423-24 (S.D.N.Y. 1998)); see also In re Kitterman, 696 F. Supp. 1366, 1370 (D. Nev. 1988) (noting that magistrate's decision not to certify to district court "dispos[es] of the matter").

5. Analysis

Turning to the three elements that must be established before an Order of contempt issues, this Court finds that the Court's December 6, 2006 Order not to discuss the pending litigation with past or current employees was "clear and unambiguous." Not only was the basis for the Order discussed at length in the presence of the principals of Atlantic, but counsel for Atlantic agreed voluntarily, in the presence of his clients, that there would be no discussion of the case with any employee pending this Court's review and decision on plaintiffs' motion for

injunctive relief. Thus, the Court finds that the first element necessary to certify a contempt has been established.

However, the proof of non-compliance must be "clear and convincing." Given the testimony before the Court, the Court cannot find that plaintiffs have met this standard. Although there were certain aspects of the testimony of defendants' witnesses that were less than credible, the Court also finds that Mr. Bowens's testimony contained a number of inconsistencies. While the Court finds incredible Mr. Goldberg's testimony that he gave Mr. Bromberg's fax number and the Court's contact information to Mr. Bowens without any discussion of the pending litigation, the Court also finds less than credible Mr. Bowens' testimony that the company, through Mr. Johnson, paid him $1,500 to drop the case. There has been nothing presented to corroborate that testimony.

In light of the fact that plaintiffs have failed to show by clear and convincing evidence that defendant violated this Court's Order, the Court finds it unnecessary to reach the third element necessary for civil contempt, whether the alleged contemnor has been diligent in attempting to comply with the court's orders. Given the foregoing, the Court declines to certify facts to the district court for a determination of contempt.

The Court finds, however, that although plaintiffs have not sufficiently demonstrated that a certification for contempt should issue, it is apparent that there has been at least a technical violation of this Court's Order of December 6, 2006, directing defendant not to discuss the case with any "putative class members." (Minute Entry dated December 6, 2006). As noted above, the Court finds it difficult to believe that Mr. Goldberg, by his own admission, gave Mr. Bromberg's fax number and the Court's contact information to Mr. Bowens without discussing

the case at all. While Mr. Goldberg's actions may not have violated the precise purposes of the Court's Order – namely, prohibiting defendant from influencing putative class members – they certainly violated the actual terms of the Order.

In plaintiffs' motion for an order of contempt, plaintiffs request several remedies for defendant's perceived violation of the December 6 Order. Specifically, in addition to a request for a contempt order, plaintiffs' requests include: that any funds paid to plaintiff Bowens and the other individuals who filed notices of consent be retained by those individuals as sanctions; that Atlantic deliver to plaintiffs all documents concerning any communications between Atlantic and any putative class member; and that plaintiffs' counsel be awarded attorneys' fees and costs incurred in connection with the motion for contempt. (Pls.' Feb. 17, 2007 Letter at 3-4).

The Court has the authority to sanction improper conduct simply as a matter of the court's inherent power. This power stems from the very nature of courts and their need to be able "'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 78 (2d Cir. 2000) (citing Chambers v. NASCO, Inc., 501 U.S. at 43). Sanctions may be imposed upon counsel or parties to a case "for bad-faith conduct or for disobeying the court's orders" as long as the attorney or party receives a hearing. Mickle v. Morin, 297 F.3d 114, 125 (2d Cir. 2002) (citing Chambers v. NASCO, Inc., 501 U.S. at 43, 49-50, 57). Furthermore, "[a]n award of sanctions under the court's inherent power must be based on 'clear evidence' and must be accompanied by 'a high degree of specificity in the factual findings.'" Id. at 125-26 (citing Oliveri v. Thompson, 803 F.2d 1265, 1272 (2d Cir. 1986)).

The Court finds that, having provided defendant and defendant's attorney with an

adequate hearing in this case, and having set forth the relevant "specific[] factual findings,"

plaintiffs' request for sanctions should be granted.  Accordingly, it is respectfully recommended

that:  1) to the extent that plaintiff Bowens or any other of the putative class members, with the

exception of Marti, may have received payment from defendant, they shall be permitted to retain

their payments;[14] 2) defendant be directed to disclose to plaintiffs any documents relating to

communications between defendant and the putative class members; and 3) plaintiffs' counsel be

awarded reasonable attorney's fees and costs incurred in connection with their motion for

sanctions.


B.  DEFENDANTS' MOTION TO DISMISS

By motion filed May 14, 2007, defendant Atlantic moves to dismiss the claims brought

by plaintiff Bowens on grounds of mootness based on defendant's offer of judgment pursuant to

Rule 68 of the Federal Rules of Civil Procedure.  (Def.'s Mem.[15] at 1).

1.  The Rule 68 Offer

On January 9, 2007, defendant served an offer of judgment on all counsel[16] to plaintiff

Bowens (the "Rule 68 Offer").  (See Kornstein Aff.[17] ¶ 2, Ex. A).  Defendant indicated in an

---

[14]The Court notes that defendant is unlikely to object to this directive, given that defendant has denied making payments to these individuals.

[15]Citations to "Def.'s Mem." refer to the Memorandum of Law in Support of Defendant Atlantic Maintenance Corp.'s Motion to Dismiss, filed May 14, 2007.

[16]Plaintiff is represented by attorneys from three law firms:  1) the Locks Law Firm; 2) Berger & Gottlieb; and 3) the Bromberg Law Office, P.C.

[17]Citations to "Kornstein Aff." refer to the Affirmation of Israel E. Kornstein, Pursuant to 28 U.S.C. § 1746, dated May 14, 2007.

accompanying letter to counsel that Atlantic arrived at the amount set forth in the Rule 68 Offer

by reviewing the company's attendance records and payroll register sheets for Mr. Bowens'

entire employment history. Based on that calculation, defendant made its Rule 68 Offer in an

amount that "exceeds that to which Plaintiff could possibly recover at trial – indeed, by a

significant multiple." (Kornstein Aff., Ex. B).[18]

By letter dated January 16, 2007, counsel for plaintiff informed the district court that

plaintiff intended to reject the Rule 68 Offer. (Kornstein Aff., Ex. E). Defendant now moves,

pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the plaintiff's

claims on the grounds that regardless of whether plaintiff accepts the Rule 68 Offer, Bowens's

claims are moot. (Def.'s Mem. at 3). In support of the motion, defendant cites several cases in

this Circuit where FLSA actions have been dismissed after a Rule 68 offer of judgment has been

made. (Id. (citing Darboe v. Goodwill Indus. of Greater N.Y. & N. N.J., Inc., No. 05 CV 4732,

2007 WL 1120468, at *3 (E.D.N.Y. Apr. 16, 2007) (holding that a "Rule 68 offer of full

damages . . . deprives the plaintiff of his personal stake in the litigation and renders it moot");

Briggs v. Arthur T. Mott Real Estate LLC, No. 06 CV 0468, 2006 WL 3314624 (E.D.N.Y. Nov.

14, 2006); Ward v. Bank of New York, 455 F. Supp. 2d 262 (S.D.N.Y. 2006); Vogel v. Am.

Kiosk Mgmt., 371 F. Supp. 2d 122 (D. Conn. 2005))).

Plaintiffs, in opposing defendant's motion, acknowledge that some courts in this district

have "permitted the 'buying off' of putative FLSA class representatives through Rule 68 offers of

---

[18]Plaintiffs do not address whether the Rule 68 offer actually would have satisfied all of
Bowens's claims.

judgment." (Pls.' Opp.[19] at 1). However, plaintiffs contend that this case is distinguishable because 1) the plaintiffs requested permission to move for class certification prior to the filing of the Rule 68 Offer; and 2) other collective class members had opted-in to the action. (Id. at 10). Moreover, plaintiffs argue that in any event, the cases cited by defendant were wrongly decided. (Id. at 8-9).[20]

As an initial matter, plaintiffs argue that following the filing of the initial complaint by Mr. Marti, a number of individuals, including Dwelon Edwards, Jason Edwards, Michael Craig, and Anthony Carter, filed complaints or consents to opt-in. (Id. at 2). Plaintiffs contend that in each of these instances, including in Mr. Marti's case, defendant either "bought off or intimidated [the] individuals into dropping their cases or discharging their attorneys." (Id.)[21] Indeed, plaintiffs presented several similarly or identically worded letters from the various opt-in members discharging plaintiffs' counsel, two of which were faxed from defendant's office fax machine. (See Mar. 15 Tr., Exs. 6-8). With respect to Mr. Bowens, plaintiffs allege that defendant attempted to buy him off with a payment of $1,500 in cash. (Pls.' Opp. at 3). Although Bowens accepted the $1,500 after writing a letter of discharge, he later changed his

---

[19]Citations to "Pls.' Opp." refer to Plaintiff[s'] Memorandum in Opposition to Defendant's "First Motion to Dismiss for Lack of Jurisdiction," filed June 1, 2007.

[20]Indeed, by letters dated August 24, September 27, and November 4, 2007, plaintiffs submitted recent decisions, including two from courts in the Second Circuit, finding that an offer of judgment under Rule 68 did not moot a plaintiff's claims under the FLSA.

[21]Although plaintiffs indicate that all of the individuals who filed notices of consent have since opted-out of the lawsuit (id. at 3), the Court has been unable to locate a withdrawal notice from Anthony Carter, who filed his notice of consent on July 17, 2006. However, the Court notes that in its Order of February 22, 2007, the Court directed "[a]ll parties and all counsel" to attend the hearing scheduled for March 12, 2007. Mr. Carter was not present at that hearing.

mind and decided to continue with the case. (Id.)

Plaintiffs argue that by "picking off" each opt-in representative plaintiff through payments or Rule 68 offers of judgment, defendant is attempting to "eviscerate Congress' provision permitting collective actions." (Id. at 4). Plaintiffs urge this Court to follow the reasoning in Weiss v. Regal Collections, 385 F.3d 337 (3d Cir. 2004), where the court held that a defendant cannot render class claims moot by offering the named plaintiff the full amount requested in his individual claim. Defendant notes in reply that Weiss involved a class action brought under Rule 23 of the Federal Rules and not a collective action under the FLSA. (Def.'s Reply[22] at 6). Defendant contends that the application of the Rule 23 case law to collective actions has been consistently rejected by the courts. (Id. (citing Darboe v. Goodwill Indus. Of Greater N.Y. v. N. N.J., Inc., 2007 WL 1120468, at *3)).

2. Analysis

The Court's jurisdiction is limited to actual cases and controversies. U.S. Const. Art. III, Sec. 2. When the defendant offers all of the relief sought by a plaintiff, the issues presented by the litigation are resolved and there is no longer a live controversy presented. See Rubery v. Buth-Na-Bodhaige, Inc., 04 CV 6337L, 2007 WL 1885127, at *1 (W.D.N.Y. July 2, 2007) (citing Fox v. Bd. of Trs. of State Univ. of N.Y., 42 F.3d 135, 140 (2d Cir. 1994)). Although the Second Circuit has not addressed the specific issue presented here, a number of courts have held that an offer of judgment for full damages renders the case moot and merits dismissal. See, e.g., Darboe v. Goodwill Indus. Of Greater N.Y. & N. N.J. Inc., 2007 WL 1120468, at *3.

---

[22]Citations to "Def.'s Reply" refer to the Reply Memorandum of Law in Further Support of Defendant Atlantic Maintenance Corp.'s Motion to Dismiss, filed June 11, 2007.

The doctrine of mootness is "based upon the case or controversy requirement of Article III of the Constitution." Fox v. Bd. of Trs. of the State Univ. of N.Y., 42 F.3d at 140 n.2 (citing Honig v. Doe, 484 U.S. 305, 317-18 (1988); Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990)), cert. denied, 515 U.S. 1169 (1995). Once the case is moot, "the federal courts 'lack[] subject matter jurisdiction over the action.'" Id. at 140 (quoting New York City Employees' Ret. Sys. v. Dole Food Co., 969 F.2d 1430, 1433 (2d Cir. 1992)) (alteration in original). The doctrine of mootness requires that the litigants maintain a "'legally cognizable interest in the outcome'" of the litigation. Id. (quoting County of L.A. v. Davis, 440 U.S. 625, 631 (1979)). In the absence of such an interest, "federal courts are without power to decide questions that cannot affect the litigants in the case before them." North Carolina v. Rice, 404 U.S. 244, 246 (1971) (per curiam). Any such defect in subject matter jurisdiction cannot be waived. See Fox v. Bd. of Trs. of State Univ. of N.Y., 42 F.3d at 140 (citing Alston v. Coughlin, 109 F.R.D. 609, 612 (S.D.N.Y. 1986), and Fed. R. Civ. P. 12(h)(3)).

In the context of class actions brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, the same general principles of mootness apply where the case involves a potential, but yet uncertified, class action. "[I]n general, if the claims of the named plaintiffs become moot prior to class certification, the entire action becomes moot." Comer v. Cisneros, 37 F.3d 775, 798 (2d Cir. 1994) (citing Board of Sch. Comm'rs of Indianapolis v. Jacobs, 420 U.S. 128, 129-30 (1975)); see also Brown v. Philadelphia Hous. Auth., 350 F.3d 338, 343-46 (3d Cir. 2003) (applying general rule that "'when claims of the named plaintiffs become moot before class certification, dismissal of the action is required'" and holding that "no implied class certification doctrine can take the place of, or be deemed a substitute for, an appropriate grant of

class certification") (quoting <u>Lusardi v. Xerox Corp.</u>, 975 F.2d 964, 974 (3d Cir. 1992)). That is

because in the absence of certification, there is no class action under Rule 23. <u>See</u> Fed. R. Civ.

P. 23(c)(1); <u>see also</u> <u>Baxter v. Palmigiano</u>, 425 U.S. 308, 310 n. 1 (1976) (noting that even

though the court had treated case as class action, the court had not certified the class under Rule

23 and therefore it was not a class action). The unnamed class members are not technically part

of the action until the court has certified the class; therefore, once the named plaintiffs' claims

are dismissed, there is no one who has a justiciable claim that may be asserted. <u>See</u> <u>Board of</u>

<u>Sch. Comm'rs of Indianapolis v. Jacobs</u>, 420 U.S. at 129 (holding action moot when named

plaintiffs challenging school newspaper rules graduated and no class had been properly certified

by the district court). Since there is no "case or controversy," <u>see</u> <u>id.</u>, the court is without

jurisdiction to proceed further. <u>See</u> <u>Fox v. Bd. of Trs. of State Univ. of N.Y.</u>, 42 F.3d at 140, n.2.

     The circumstances are different, however, where the class has been certified in

accordance with the Federal Rules. <u>See</u> <u>Sosna v. Iowa</u>, 419 U.S. 393, 399 (1975) (finding that

certification of the class "significantly affects the mootness determination"). It is settled law that

once a class has been certified, the entire action is not mooted simply because the class

representative's claim is mooted. <u>See</u> <u>County of Riverside v. McLaughlin</u>, 500 U.S. 44, 51-52

(1991) (holding,"'the termination of a class representative's claim does not moot the claims of

the unnamed members of the class'") (quoting <u>Gerstein v. Pugh</u>, 420 U.S. 103, 110-11, n.11

(1975)); <u>Comer v. Cisneros</u>, 37 F.3d at 798 (holding that "class certification will preserve an

otherwise moot claim"). The courts have recognized the "special problems associated with class

action mootness," <u>Comer v. Cisneros</u>, 37 F.3d at 798-99, and held that "'[s]pecial mootness rules

apply in the class action context, where the named plaintiff purports to represent an interest that

extends beyond his own.'" Weiss v. Regal Collections, 385 F.3d at 342 (quoting Lusardi v. Xerox Corp., 975 F.2d at 974).

One instance in which the Supreme Court has suggested that courts take a "flexible" approach to questions of mootness in the context of a class action is where there are claims that are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires." United States Parole Comm'n v. Geraghty, 445 U.S. 388, 399-400 (1980). Such "inherently transitory" claims will not be held moot. See id. at 400; see also County of Riverside v. McLaughlin, 500 U.S. at 52 (holding that where claims are "inherently transitory," they do not become moot merely because class certification has not been granted) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. at 399). Whether this exception to the mootness rule applies in a particular case is "intensely factbound." White v. OSI Collection Servs., Inc., No. 01 CV 1343, 2001 WL 1590518, at *3 (E.D.N.Y. Nov. 5, 2001).

Some courts have held that the certification of the class "relates back" to the time of the filing of the Complaint to cover the situation where a motion for class certification is pending at the time that the defendant makes an offer of judgment under Rule 68 which would satisfy the named plaintiff's individual claims and otherwise moot the action.[23] See Nasca v. GC Servs. Ltd. P'ship, No. 01 CV 10127, 2002 WL 31040647, at *2-3 (S.D.N.Y. Sept. 12, 2002). In these

---

[23]Generally, settlement of an individual plaintiff's claim would render the action moot because there would no longer be a controversy between the parties. See U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 25 (1994); British Int'l Co. Ltd. v. Seguros La Republica, S.A., 354 F.3d 120, 122-23 (2d Cir. 2003); Agee v. Paramount Commc'ns, Inc., 114 F.3d 395, 398-99 (2d Cir. 1997).

limited circumstances, application of the "relation back" doctrine is used to prevent defendants from attempting to circumvent a class judgment by "'picking off' or 'buying off' named plaintiffs through the mooting of individual claims – i.e. settling with the named plaintiff after a class action complaint has been filed." Novella v. Westchester County, No. 02 CV 2192, 2004 WL 3035405, at *4 (S.D.N.Y. Dec. 29, 2004) (surveying Supreme Court and Second Circuit precedents and citing White v. Mathews, 559 F.2d 852, 857 (2d Cir. 1977)); see Weiss v. Regal Collections, 385 F.3d at 345-48 (applying relation back doctrine "in light of defendants' tactic of 'picking off' lead plaintiffs with a Rule 68 offer to avoid a class action"); Nasca v. GC Servs. Ltd. P'ship, 2002 WL 31040647, at *2 (noting the problem posed by the "picking off" of named plaintiffs and the concern expressed about this issue in Deposit Guarantee Nat'l Bank v. Roper, 445 U.S. 326, 339 (1980)); see also Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1041 (5th Cir. 1981) (concluding that the case should not be dismissed as moot based on the tender to the named plaintiffs where there was pending "a timely filed and diligently pursued motion for class certification"); Susman v. Lincoln Am. Corp., 587 F.2d 866, 869-71 (7th Cir. 1978) (same).

In Deposit Guarantee National Bank v. Roper, the Supreme Court stated:

> To deny the right to appeal simply because the defendant has sought to "buy off" the individual private claims of the named plaintiffs would be contrary to sound judicial administration. Requiring multiple plaintiffs to bring separate actions, which effectively could be "picked off" by a defendant's tender of judgment before an affirmative ruling on class certification could be obtained, obviously would frustrate the objectives of class actions.

445 U.S. at 339.[24]  In this vein, some courts have made an exception where the Rule 68 offer of judgment was made so early in the action that the plaintiff had not had a reasonable opportunity to move for class certification.  See, e.g., Weiss v. Regal Collections, 385 F.3d at 348; McDowall v. Cogan, 216 F.R.D. 46, 47-52 (E.D.N.Y. 2003) (holding offer of judgment to named plaintiff made before defendants had answered did not moot class claims); Nasca v. GC Servs. Ltd. P'ship, 2002 WL 31040647, at *3; Schaake v. Risk Mgmt. Alternatives, Inc., 203 F.R.D. 108, 110-12 (S.D.N.Y. 2001) (finding offer of judgment made only 32 days after filing of complaint did not moot class claims even though no motion for certification had been filed); White v. OSI Collection Servs., Inc., 2001 WL 1590518, at *4 (applying relation back doctrine where defendant made offer of judgment to plaintiff one day after answering and eighteen days before plaintiff sought leave to move for class certification); Eckert v. Equitable Life Assurance Soc. of the U. S., 227 F.R.D. 60, 63-64 (E.D.N.Y. 2005) (allowing putative securities fraud class action to continue after the individual plaintiff had settled his claims, and permitting new party to intervene even though no class motion had been filed because the plaintiff "did not have a realistic and reasonable opportunity to move for class certification" where the defendant had not yet filed its answer).

Other courts, however, have rejected this analysis, holding that where there has been no motion for class certification filed and the plaintiff accepts a Rule 68 offer of judgment offering

---

[24]The Court in Deposit Guaranty Nat'l Bank v. Roper was careful to note that "[d]ifficult questions arise as to what, if any, are the named plaintiffs' responsibilities to the putative class prior to certification; this case does not require us to reach these questions." Id. at 340 n.12 (emphasis in original).

the maximum amount recoverable under the statute and providing complete relief to the named plaintiff, the "named representative's claim becomes moot . . . [and] the entire case is to be dismissed for lack of subject matter jurisdiction." Ambalu v. Rosenblatt, 194 F.R.D. 451, 453 (E.D.N.Y. 2000); see also Greif v. Wilson, Elser, Moskowitz, Edelman & Dicker LLP, 258 F. Supp. 2d 157, 160-61 (E.D.N.Y. 2003) (applying reasoning of Ambalu); Tratt v. Retrieval Masters Creditors Bureau, Inc., No. 00 CV 4560, 2001 WL 667602, at *2 (E.D.N.Y. May 23, 2001) ("adopt[ing] Judge Nickerson's opinion [in Ambalu] as being entirely dispositive"); Wilner v. OSI Collection Servs., Inc., 198 F.R.D. 393, 394-96 (S.D.N.Y. 2001) (agreeing with reasoning in Ambalu while discussing distinguishing facts); cf. Edge v. C. Tech Collections, Inc., 203 F.R.D. 85, 87-88 (E.D.N.Y. 2001) (agreeing with reasoning in Ambalu but finding "a case or controversy still remain[ed]" because Rule 68 offer of judgment did not offer the maximum amount recoverable under the FDCPA).

Similarly, if the court concludes that plaintiffs have unduly delayed in filing a motion for class certification, the claims will be found moot. See Weiss v. Regal Collections, 385 F.3d at 348; Nasca v. GC Servs. Ltd. P'ship, 2002 WL 31040647, at *2; Weiss v. La Suisse, 161 F. Supp. 2d 305, 319 (S.D.N.Y. 2001) (denying motion to amend the complaint and motion for class certification filed more than three years after commencement of the action, noting that even "[a]ssuming arguendo that class certification would be appropriate, [the court is] constrained to deny the motion because of plaintiffs' tardiness in making it").

In the context of an FLSA opt-in action, courts have held that a Rule 68 offer moots the named plaintiff's claim. See, e.g., Darboe v. Goodwill Indus. of Greater N.Y. & N. N.J., 2007 WL 1120468, at *3; Briggs v. Arthur T. Mott Real Estate LLC, 2006 WL 3314624, at *4.

However, where the offer either fails to satisfy all of plaintiff's damages or where there are additional plaintiffs who have opted in, dismissal is not appropriate. See Yeboah v. Cent.Parking Sys., No. 06 CV 0128, 2007 WL 3232509, at *5 (E.D.N.Y. Nov. 4, 2007) (noting that presence of just one additional opt-in plaintiff does not moot claim); Rubery v. Buth-Na-Bodhaige, Inc., 2007 WL 1885127, at *2; Raney v. Young & Brooks, No. H-05-0410, 2005 U.S. Dist. LEXIS 43813, at *2 (S.D. Tex. Apr. 26, 2005); Reyes v. Carnival Corp., No. 04-21861-CIV 2005 U.S. Dist. LEXIS 11948, at *7-9 (S.D. Fla. May 25, 2005); Reed v. TJX Cos., No. 04 C 1247, 2004 U.S. Dist. LEXIS 21605, at *2 (N.D. Ill. Oct. 26, 2004). The court in Rubery noted the concern that Rule 68 offers "may be wielded as a strategic weapon to frustrate the FLSA's very object – ensuring that every employee receives 'a fair day's pay for a fair day's work.'" 2007 WL 1885127 at *2 (quoting A.H. Phillips v. Walling, 324 U.S. 490, 493 (1945). Thus, where the motion to dismiss has been made prior to a determination on the pending motion for class certification and other individuals have sought to join, courts have held that dismissal of plaintiff's claim is premature. Id. at *3. See also Roble v. Celestica Corp., No. 06 CV 2934, 2007 WL 2669439, at *3 (D. Minn. Sept. 6, 2007) (noting that the timing of a Rule 68 offer is relevant only if it can be demonstrated that there are no other similarly situated plaintiffs with an interest in the lawsuit).

The Court finds that the cases cited by defendant can be distinguished from the situation at hand. Defendant asserts in reply that plaintiffs "can point to nothing" in the Briggs, Ward, Darboe, or Vogel decisions to suggest that those courts relied on the fact that no motion for collective action was pending and that no other plaintiffs had opted-in to the action in granting the defendants' motions to dismiss. (Def.'s Reply at 7). To the contrary, however, the courts in

all of those decisions specifically noted that at least one of these factors was at issue – namely, that there was no pending motion to certify a class or that no other individuals had opted-in to the action. See Briggs v. Arthur T. Mott Real Estate LLC, 2006 WL 3314624, at *1, 3 (both factors at issue); Ward v. Bank of New York, 455 F. Supp. 2d at 265 (noting that no other plaintiffs had opted-in); Darboe v. Goodwill Indus. of Greater N.Y. & N. N.J., 2007 WL 1120468, at *3 (both factors at issue); Vogel v. Am. Kiosk Mgmt., 371 F. Supp. 2d at 128 (noting that lone plaintiff's claims will be mooted by offer of judgment). Furthermore, as noted above, in the Yeboah case, the court specifically held that the presence of just one additional plaintiff "requires the conclusion that even if defendant's Rule 68 offer represented or exceeded plaintiff's maximum recovery, it neither mooted plaintiff's FLSA claim nor deprived this Court of subject matter jurisdiction." 2007 WL 3232509, at *5.

The Court recognizes that plaintiff Bowens may be the lone plaintiff in this case,[25] and that defendant made him an offer under Rule 68, which plaintiff did not accept. However, unlike in the decisions cited by defendant, there was clear evidence at the outset of this case that other individuals were interested in joining. Indeed, at one time, there were no fewer than six Atlantic employees who had filed notices of consent, where as only one other than the named plaintiff would have sufficed. See Yeboah v. Cent. Parking Sys., 2007 WL 3232509, at *5. Why these individuals then changed their minds is the subject of much dispute between the parties. It appears fairly clear to this Court that defendant played a role in the decisions of – at a minimum – Jason and Dwelon Edwards, whose letters indicating their desire to withdraw from the case

---

[25]As noted at p. 27 n.21, supra, the Court is not aware of any withdrawal from this action filed by Anthony Carter, who may continued to be an opt-in.

were sent from defendant's fax machine. Furthermore, the parties vigorously dispute whether defendant attempted to pay Mr. Bowens after he did not accept the Rule 68 offer. To the extent that plaintiffs have experienced difficulties progressing with their claims and retaining putative class members, it appears that defendant has contributed to these difficulties.

Several other factors counsel against granting defendant's motion to dismiss, including the policies behind the FLSA and class actions, plaintiffs' pending motion to certify the case for collective action notice, and this Court's Order of January 30, 2007, directing that neither party was to have contact with putative class members. First, although defendant takes issue with plaintiffs' concern that defendant not be allowed to "pick off" a representative plaintiff, the Yeboah court noted that other concerns associated with class actions under Rule 23 are also applicable to FLSA cases. That court noted:

> [E]ven if defendants are correct that permitting defendants to "pick off" individual FLSA plaintiffs presents no danger of prejudicing absent class members, as it would in the Rule 23 context, the Roper Court described at least two other dangers. First . . . the Court declared that permitting such "pick-offs" "would obviously frustrate the objectives of class actions" – that is, enabling plaintiffs to redress wrongs even "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages . . . ." 445 U.S. at 339. Second, the Court observed that permitting pick-offs "would invite waste of judicial resources by stimulating successive suits brought by others claiming aggrievement." Id. Both dangers appear to exist in the FLSA context, as well.

2007 WL 3232509, at *3. These concerns seem to have been brought to life in this case, where plaintiffs have had to amend their complaint three times in light of the sudden withdrawal of the first two named plaintiffs. As noted above, the circumstances surrounding the withdrawal of several of the opt-in plaintiffs are murky at best, but to the extent that defendant has been

involved in these withdrawals, they indicate an attempt to circumvent the FLSA and the objectives of class actions by "picking off" putative plaintiffs.

Second, although it was filed three days after defendant's motion to dismiss, plaintiffs do have a pending motion for class certification, for which plaintiffs had requested a pre-motion conference almost four months earlier. Furthermore, the time between defendant's appearance in this case and the filing of plaintiffs' motion was largely spent dealing with plaintiffs' motion for a protective order and allegations that defendant violated that protective order. The issues underlying the request for the protective order and the motion for contempt go to the very heart of defendant's motion to dismiss – namely, whether plaintiffs have demonstrated that individuals other than plaintiff Bowens wish to join in the case. As such, any delay on plaintiffs' part was not a result of their inattention to this case.

Finally, the Court is mindful that on January 30, 2007, it extended the terms of the protective order to apply to both defendant and plaintiffs, such that plaintiffs were not permitted to contact putative class members in an attempt to solicit participation in this case. In Yeboah, the one additional plaintiff, whose presence meant that the named plaintiff's claims were not moot, filed his notice of consent to participate in the case several months after the defendants made their Rule 68 offer to the named plaintiff. See 2007 WL 3232509, at *1. Thus, to the extent that other individuals would have been interested in joining plaintiffs' suit here, this Court's Order made it much more difficult for them to do so. These factors, along with the highly questionable circumstances surrounding the withdrawals of certain of the individuals who filed notices of consent, lead the Court to conclude that defendant's motion to dismiss should be denied.

In accordance with the foregoing, the Court respectfully recommends that defendant's motion to dismiss plaintiffs' claims as moot be denied.


## C. MOTION TO CERTIFY CASE FOR COLLECTIVE ACTION NOTICE

By notice of motion dated May 17, 2007, plaintiffs move to have their case certified for collective action notice. Under the FLSA, plaintiffs must move the court to determine whether all similarly situated employees should receive notice under Section 216(b). 29 U.S.C. § 216(b). See Hoffman-La-Roche, Inc. v. Sperling, 493 U.S. 165, 169 (1989). The named plaintiff must also show that he is similarly situated to the prospective plaintiffs who would benefit from notice of the right to join. See Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d 101, 104 (S.D.N.Y. 2003). In this case, plaintiffs move for an Order, pursuant to 29 U.S.C. § 216(b) of the FLSA: 1) conditionally certifying a class consisting of all janitorial and maintenance service workers employed by defendant during the past three years; 2) authorizing plaintiffs to provide judicial notice to all class members; and 3) requiring defendant to produce an electronic list of all class members and their contact information in order to facilitate service of the class notice. (Pls.' Mem.[26] at 1). Defendant opposes plaintiffs' motion on the grounds that there has been no showing that there are similarly situated individuals who could appropriately join in the action. (Def.'s Opp.[27] at 2).

---

[26]Citations to "Pls.' Mem." refer to Plaintiff[s'] Memorandum in Support of Motion to Certify Case for Collective-Action Notice, filed May 17, 2007.

[27]Citations to "Def.'s Opp." refer to defendant's Memorandum of Law in Opposition to Plaintiff[s'] "Motion to Certify Case for Collective Action-Notice [sic]," filed June 6, 2007.

1. <u>Standards for Certification Under the FLSA</u>

Under the FLSA, employers are required to compensate covered employees for all the work performed, including overtime, in order to remedy "labor conditions detrimental to the maintenance of the minimum standard of living necessary for the health efficiency, and general well-being of workers." 29 U.S.C. §§ 202(a), 207(a)(1). <u>See</u> <u>Reich v. N.Y. City Transit Auth.</u>, 45 F.3d 646, 648-49 (2d Cir. 1995) (citations omitted). Pursuant to Section 216(b) of the FLSA, an employee may bring a private right of action to "recover unpaid overtime compensation and liquidated damages from employers who violate the Act's overtime provisions." <u>Hoffman v. Sbarro, Inc.</u>, 982 F. Supp. 249, 260 (S.D.N.Y. 1997); <u>see also</u> <u>Gjurovich v. Emmanuel's Marketplace, Inc.</u>, 282 F. Supp. 2d at 103. Under the statute, an employee may bring a collective action "for and in behalf of himself . . . and other employees similarly situated." 29 U.S.C. § 216(b). Unlike a class action brought pursuant to Rule 23 of the Federal Rules of Civil Procedure, a collective action brought under the FLSA is binding only upon those employees who affirmatively "opt in" by giving consent in writing to become a party to the action. <u>Id.</u> <u>See</u> <u>Patton v. Thomson Corp.</u>, 364 F. Supp. 2d 263, 266 (E.D.N.Y. 2005); <u>Gjurovich v. Emmanuel's Marketplace, Inc.</u>, 282 F. Supp. 2d at 103-04.

Although the statute has no specific provision for issuing notice in a collective action under the FLSA, the Supreme Court in <u>Hoffman-LaRoche Inc. v. Sperling</u>, 493 U.S. at 171-173, held that it was appropriate for courts to authorize class notice to prospective class members in an FLSA action in order to serve the "broad remedial goal" of the Act. <u>See also</u> <u>Braunstein v. E. Photographic Labs., Inc.</u>, 600 F.2d 335, 335-36 (2d Cir. 1978) (holding that the district court "has the power to order that notice be given to other potential members of the plaintiff class

under the 'opt-in' provisions of the [FLSA]"). As a threshold matter, the Court must determine "whether other employees to whom such notice might be sent are 'similarly situated.'" Patton v. Thomson Corp., 364 F. Supp. 2d at 266-67 (quoting Hoffman-LaRoche Inc. v. Sperling, 493 U.S. at 169); see also Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d at 104. The term "similarly situated," although not defined in the statute, has been interpreted as requiring only a "modest factual showing sufficient to demonstrate that [the named plaintiff] and potential plaintiffs together were victims of a common policy or plan that violated the law." Hoffman v. Sbarro, Inc., 982 F. Supp. at 261 (citations omitted). See also Patton v. Thomson Corp., 364 F. Supp. 2d at 267; Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d at 104. The reason that the burden is significantly less than that required to sustain a class certification motion under Rule 23 is that the FLSA's opt-in provision merely provides an opportunity for potential plaintiffs to join and is only a preliminary determination as to which potential plaintiffs may in fact be similarly situated. See Patton v. Thomson Corp., 364 F. Supp. 2d at 267; Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d at 104.

2. Analysis

In the instant case, plaintiffs have submitted a declaration from plaintiff Bowens, confirming that all janitorial and maintenance workers employed by defendant Atlantic have been subjected to a policy that requires them to work through much of their lunch hour, as well as additional hours "off the clock." (Bowens Decl.[28] ¶¶ 5-11). For this alleged violation of the FLSA, plaintiff Bowens asserts that he and other members of the putative class are entitled to

---

[28]Citations to "Bowens Decl." refer to the Declaration of Arquis Bowens in Support of Motion to Certify Case for Collective-Action Notice, dated May 15, 2007.

receive overtime premium for any hours worked over 40 in a week period. (Id. ¶¶ 3, 13-14). Courts have approved the issuance of notice under similar circumstances. See, e.g., Young v. Cooper Cameron Corp., 229 F.R.D. 50, 55 (S.D.N.Y. 2005); Patton v. Thomson Corp., 364 F. Supp. 2d at 267; Roebuck v. Hudson Valley Farms, Inc., 239 F. Supp. 2d 234, 238-39 (N.D.N.Y. 2002).

Defendant opposes plaintiffs' request for notice, arguing that "[p]laintiff has failed to show that there are any similarly situated individuals who would desire to (and could appropriately) opt in. Plaintiff Bowens stands as the lone plaintiff." (Def.'s Opp. at 3). Defendant contends that Bowens's Declaration fails to satisfy even the "modest" burden imposed upon FLSA plaintiffs, in that his Declaration fails to put forth any "factual showing" that there are victims of a common policy to violate the Act. (Id. at 4). Instead, defendant asserts that Bowens' Declaration is impermissibly based on "conclusory allegations which lack evidentiary value." (Id. (citing Morales v. Plantworks, Inc., No. 05 CV 2349, 2006 WL 278154, at *3 (S.D.N.Y. Feb. 2, 2006) (finding an attorney's affidavit to be insufficient to support a claim that other employees were similarly situated))).

Defendant also argues that plaintiff's Declaration is inconsistent with the allegations set forth in the Complaint, wherein plaintiff sought to represent a class of individuals who were not paid overtime compensation and who had improper deductions taken from their wages. (Id. at 5). By contrast, in the Declaration, plaintiff asserts that he was made to work through lunch and off the clock, which defendant contends is not a claim for overtime pay. (Id.)[29] Defendant further

---

[29] Defendant also argues that the Court should not consider plaintiff's May 15, 2007 Declaration because at the March 12, 2007 hearing, plaintiff did not testify about the statements

42

argues that based on Bowens's testimony during the hearing, where he professed to have little knowledge about the employment histories of other former opt-in plaintiffs, it is clear that Bowens does not know whether there are any other similarly situated individuals. (Def.'s Opp. at 6). Moreover, defendant points out that although there were other individuals who originally may have indicated an interest in joining in this lawsuit, they have all dropped out and none of them appeared at the March 12th hearing, despite the Court's direction that all interested individuals appear. (Id. at 3).

Although defendant is correct that plaintiff has provided little, if any, documentary support for his allegations that other janitorial and maintenance workers in defendant's two separate New Jersey facilities were subject to the same policies claimed by plaintiff, the Court notes that the case rests on allegations of time worked "off the clock." It would be highly unusual for a defendant who did require its employees to work off the clock to keep records of that time. Moreover, defendant has not submitted an affidavit refuting the accuracy of plaintiff's allegations regarding the lunchtime work, and similar allegations have been found to be a

---

later set forth in the Declaration and accordingly, defendant had no opportunity to cross-examine plaintiff on these issues. (Id.) Defendant, however, cites no authority to support the proposition that there need be a full-blown evidentiary hearing at which plaintiffs in a collective action would be required to testify regarding their claims. Indeed, the caselaw makes it clear that the plaintiff's burden at this stage is minimal and no hearing is required. Although the Court indicated that the issue of collective action certification would be one of the issues addressed at the hearing held in March, there was no requirement that the plaintiff, who had not yet even filed his motion for certification and notice, testify regarding the allegations of similarity. More importantly, the defendant's counsel argued at the hearing that the plaintiff's testimony should be limited to events occurring after December 5, 2006 and to that extent may have limited himself in the scope of his inquiry. (Mar. 12 Tr. at 6-7). There was never a ruling by this Court that prevented defendant's counsel from inquiring further of plaintiff with the understanding that the plaintiff did intend to make a motion for class notice.

sufficient basis to certify a collection action for overtime. See, e.g., Hens v. ClientLogic Operating Corp., No. 05 CV 381S, 2006 WL 2795620, at *2-4 (W.D.N.Y. Sept. 26, 2006). Thus, the Court finds that plaintiff has satisfied his minimal burden of establishing that he is sufficiently similarly situated to warrant issuance of a class notice.

The Court reaches this conclusion, in part, based on the history of the proceedings and the fact that soon after the case was filed, there were at least five other individuals who sought to participate and signed consents. Although these individuals eventually dropped their claims, they did so under extremely suspect circumstances. Plaintiffs' counsel have alleged that these other individuals were either improperly bought off or intimidated into dropping their claims. Defendant denies any impropriety and suggests that they simply decided to gratuitously withdraw their claims. The fact that several of the letters withdrawing these claims were not only identically worded but were faxed from defendant's own office fax machine raised serious questions in this Court's mind and prompted the Court to ask that these individuals appear at the hearing. The fact that they chose not to appear, coupled with Bowens' own testimony regarding Johnson's efforts to dissuade him from appearing, are extremely disturbing. Without deciding whether there has been any impropriety, the Court is clearly aware that there were at least six individuals who claimed similar violations. Given that there has been no discovery addressed to the class because the case has been bogged down with issues relating to contempt and mootness, the Court finds that it is appropriate to order the issuance of notice to the class. As the court in Patton noted, it is appropriate at this stage to issue notice rather than waiting for the completion of discovery because "doing so now is 'a means of facilitating the Act's broad remedial purpose and promoting efficient case management.'" Patton v. Thomson Corp., 364 F. Supp. 2d at 267-

44

68 (citation omitted). It also is appropriate to preserve the claims of individuals whose claims might otherwise become time-barred while discovery proceeds. Id. at 268. Of course, as noted in Patton, the defendant is not prejudiced by this decision, because the ruling is only preliminary and may be revisited if, after discovery, it is determined that the additional plaintiffs who may seek to join are not similarly situated. Id.; see also Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d at 105.

Accordingly, it is respectfully recommended that plaintiffs' motion to certify the case for collective action and that notice issue be granted.

### 3. The Notice

Having recommended that the plaintiffs' motion to issue class notice should be granted, the Court considers defendant's objections to the plaintiffs' proposed notice. In the first instance, defendant seeks to prevent the plaintiffs from obtaining disclosure of the names and addresses of similarly situated plaintiffs, arguing that it "would be analogous to the court handing Plaintiff a fishing rod in the middle of the desert," and indicating that defendant is concerned not only with the potential of "facilitat[ing] class action abuse," but also with issues of privacy, identity theft and fraud. (Def.'s Opp. at 14-15). These concerns, however, are apparent in any class action context where individualized notice must be sent, and are not, given the Court's conclusion that notice is appropriate, persuasive. Accordingly, it is respectfully recommended that defendants be ordered to provide the names, last known contact information, employment dates, and last four digits of the social security numbers for all current and former Atlantic employees who, during the past three years held the position of janitorial or maintenance worker or performed such duties at any of the Atlantic sites. See, e.g., Patton v. Thomson Corp., 364 F. Supp. 2d at 268.

With respect to the form of the Notice itself, defendant argues that it is overly broad and defective in that it "(1) constitutes direct solicitation by Plaintiff's counsel; (2) appears to be a perceived endorsement by the Court; (3) refers to unrelated claims of discrimination and retaliation; (4) fails to advise potential plaintiffs of the case status; and (5) contains no deadline for the opt-in period." (Id. at 18). Specifically, defendant objects to language in the proposed Notice that directs potential class members to contact counsel for further information and that instructs potential opt-ins to send their Consent Forms to plaintiff's lawyers, with an indication that they consent to representation by class counsel. Language directing potential class members to plaintiffs' counsel for further information appears to be standard in such Notices. See, e.g., Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp.2d at 110-11; Hallissey v. America Online, Inc., No. 99 CV 3785, 2008 WL 465112, at *3 (S.D.N.Y. Feb. 19, 2008); Guzman v. VCM, Inc., No. 07 CV 1126, 2007 WL 2994278, at *8 (E.D.N.Y. Oct. 11, 2007).

With respect to where the Consent Forms should be sent, however, recent decisions have held that such a provision improperly discourages class members from seeking outside counsel and thus, courts have directed that Consent Forms be sent to the Clerk of Court. See Hallissey v. America Online, Inc., 2008 WL 465112, at *4; Guzman v. VCM, Inc., 2007 WL 2994278, at *9. As such, the Court directs that the Notice be amended so that Consent Forms are sent to the Clerk of Court.

With respect to defendant's objections to the lack of a finite opt-in period, courts have held that a sixty (60)-day period is sufficient for the return of Consent Forms. See Hallissey v. America Online, Inc., 2008 WL 465112, at *4; Gjurovich v. Emmanuel's Marketplace, Inc., 282 F. Supp. 2d at 107. The Court notes that one of the previously approved exemplar Notices

46

submitted by plaintiffs in this case also contains a sixty-day window. In light of this precedent and given that plaintiffs' proposed class is relatively localized and not extremely large, the Court concludes that a sixty-day time period is sufficient for the return of Consent Forms.

Having reviewed the defendant's remaining objections as to "perceived endorsement by the Court,"[30] claims of discrimination and retaliation, and case status, the Court finds them to be without merit. Plaintiffs are directed to amend the proposed Notice so that the Consent Forms are returnable to the Clerk of Court within sixty days from final approval of the Notice.[31] To the extent that defendant seeks to raise additional arguments regarding the propriety of the language proposed by plaintiff's counsel, the Court Orders the parties to meet and confer and propose a joint notice within two weeks of the district court's approval of this Report, if so approved.

In accordance with the foregoing, the Court respectfully recommends that plaintiffs' motion to certify the case for collective-action notice be granted, and that plaintiffs should amend the proposed Notice so that the Consent Forms are to be returned to the Clerk of Court within sixty days of final approval of the Notice.

---

[30]Defendant objects to the language at the top of the form that states that it is an "Official Court-Ordered Notice" and the language at the conclusion of the form that indicates that Notice has been ordered by the court. These objections are without merit; the language is standard and is essential to inform potential litigants that in fact the Notice that they are receiving has been approved and ordered by the court. The language does not, in any way, suggest to potential claimants that the court has made a determination as to the merits of the case. Furthermore, the Notice itself contains a clause indicating that "[t]he Court has not decided who is right or wrong."

[31]The Court notes that the proposed Notice also contains a number of typographical errors, which the Court assumes will be corrected in the final version of the Notice.

D. MOTION FOR DISQUALIFICATION OF PLAINTIFFS' COUNSEL

By letters dated January 16 and February 19, 2007, defendant moves to disqualify

Bowens's attorneys from further representing anyone in this action, citing the attorneys' alleged

failures to inform the Court of certain developments in the case and their alleged practice of

preventing the Court and defendant from "hearing from" the individuals who have opted-in to the

case. (Def.'s Jan. 16, 2007 Letter at 3-4; Def.'s Feb. 19, 2007 Letter at 1-3).

1. Standards for a Motion for Disqualification

It is well established that the Court's authority to disqualify an attorney stems from its

general supervisory power over the attorneys appearing before it, see Handelman v. Weiss, 368

F. Supp. 258, 263 (S.D.N.Y. 1973); see also United States v. Miller, 624 F.2d 1198, 1201 (3d

Cir. 1980), and the determination of disqualification is discretionary in nature. Hull v. Celanese

Corp., 513 F.2d 568, 571 (2d Cir. 1975); see also Laker Airways Ltd. v. Pan Am. World

Airways, 103 F.R.D. 22, 27 n.4 (D.D.C. 1984). There is a longstanding rule that,

> "[w]hen dealing with ethical principles, . . . we cannot paint with
> broad strokes. The lines are fine and must be so marked. Guideposts
> can be established when virgin ground is being explored, and the
> conclusion in a particular case can be reached only after painstaking
> analysis of the facts and precise application of precedent."

Fund of Funds, Ltd. v. Arthur Andersen & Co., 567 F.2d 225, 227 (2d Cir. 1977) (quoting United

States v. Standard Oil Co., 136 F. Supp 345, 367 (S.D.N.Y. 1955)). Indeed, as the court in Fund

of Funds, Ltd, noted, "in deciding questions of professional ethics men of good will often differ

in their conclusions." Id. Recognizing this, the Second Circuit has held that the district court's

finding will only be overturned upon a showing of abuse of that discretion. Bobal v. Rensselaer

Polytechnic Inst., 916 F. 2d 759, 764 (2d Cir. 1990) (citing Hull v. Celanese Corp., 513 F.2d at

571), <u>cert. denied</u>, 499 U.S. 943 (1991).

In considering a motion for disqualification, this Court is mindful of its responsibility to "preserve a balance, delicate though it may be, between an individual's right to his own freely chosen counsel and the need to maintain the highest ethical standards of professional responsibility." <u>Emle Indus., Inc. v. Patentex, Inc.</u>, 478 F.2d 562, 564-65 (2d Cir. 1973); <u>accord</u> <u>General Motors Corp. v. City of N.Y.</u>, 501 F.2d 639, 649 (2d Cir. 1974); <u>see also</u> <u>Fund of Funds Ltd. v. Arthur Andersen & Co.</u>, 567 F.2d at 237 (noting that "above all else, we must maintain public trust in the integrity of the Bar"). In considering defendant's motion for disqualification, this Court is mindful of its responsibility to supervise the members of its bar, <u>see id.</u>, and recognizes the admonition of the Second Circuit that "any doubt is to be resolved in favor of disqualification." <u>Hull v. Celanese Corp.</u>, 513 F.2d at 571; <u>see also</u> <u>Baird v. Hilton Hotel Corp.</u>, 771 F. Supp. 24, 27 (E.D.N.Y. 1991) (holding that "'if there were any doubt as to the propriety of our action, we would resolve it in favor of disqualification'") (quoting <u>Cheng v. GAF Corp.</u>, 631 F.2d 1052, 1059 (2d Cir. 1980), <u>judgment vacated on other grounds</u>, 450 U.S. 903 (1981)).

The disqualification of an attorney upon the motion of opposing counsel is a serious sanction that ought not be imposed lightly. It is well-established that courts in the Second Circuit approach motions for disqualification with "fairly strict scrutiny" and that they are generally disfavored. <u>See</u> <u>Lamborn v. Dittmer</u>, 873 F.2d 522, 531 (2d Cir. 1989); <u>accord</u> <u>Ragdoll Prods. (UK) Ltd. v. Wal-Mart Stores, Inc.</u>, No. 99 CV 2101, 1999 WL 760209, at *1 (S.D.N.Y. Sept. 27, 1999) (holding that motions to disqualify are "subject to strict scrutiny"); <u>see also</u> <u>Stratavest Ltd. v. Rogers</u>, 903 F. Supp. 663, 666 (S.D.N.Y. 1995) (noting that "[m]otions to disqualify

49

opposing counsel are viewed with disfavor in this Circuit"); United States Football League v. Nat'l Football League, 605 F. Supp. 1448, 1452 (S.D.N.Y. 1985) (holding same). Indeed, courts have become increasingly "skeptical of motions to disqualify counsel, and they now approach them with cautious scrutiny." Laker Airways Ltd. v. Pan American World Airways Ltd., 103 F.R.D. at 28. See also Bennett Silvershein Assocs. v. Furman, 776 F. Supp. 800, 802 (S.D.N.Y. 1991) (noting that "[m]otions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are 'often interposed for tactical reasons'") (citing United States Football League v. Nat'l Football League, 605 F. Supp. at 1452 (collecting cases)); Laker Airways Ltd. v. Pan American World Airways, 103 F.R.D. at 28 (noting that "[d]isqualification motions have become increasingly popular tools of the litigation process, being used . . . for purely strategic purposes") (internal quotations omitted). At least one court has commented that "[d]isqualification motions are subject to abuse for tactical purposes," often resulting in "complex satellite litigation extraneous to the case." Universal City Studios, Inc. v. Reimerdes, 98 F. Supp. 2d 449, 455 (S.D.N.Y. 2000); see also Evans v. Artek Sys. Corp., 715 F.2d 788, 790 (2d Cir. 1983) (noting that "'even when made in the best of faith, such motions inevitably cause delay'") (quoting Board of Educ. v. Nyquist, 590 F.2d 1241, 1246 (2d Cir. 1979)).

Moreover, because disqualification deprives a client of its choice of counsel, the Second Circuit has cautioned courts that disqualification of an attorney is only appropriate where there has been a clear violation of the Code of Professional Responsibility that leads to a "significant risk of trial taint," Glueck v. Jonathan Logan, Inc., 653 F.2d 746, 748 (2d Cir. 1981), such as when "the attorney is in a position to use privileged information acquired in the representation of a client against that client in another matter," Universal City Studios, Inc. v. Reimerdes, 98 F.

50

Supp. 2d at 455, or when "there is a significant risk that [a conflict of interest] will affect the attorney's ability to represent his or her client with vigor." Id.; see also Mitchell v. Metro. Life Ins. Co., Inc., No. 01 CV 2112, 2002 WL 441194, at *4 (E.D.N.Y. Mar. 21, 2002) (noting that "relief will be granted only when the facts concerning the lawyer's conduct pose[ ] a significant risk of trial taint").

The Southern and Eastern Districts of New York have adopted the New York State Lawyer's Code of Professional Responsibility (the "Code"), modeled after the ABA's Model Code of Professional Responsibility, as their applicable professional responsibility code. See Local Rules of the Southern and Eastern Districts of New York, Rule 1.5(b)(5).[32] See also NCK Org. Ltd. v. Bregman, 542 F.2d 128, 129 n. 2 (2d. Cir. 1976) (noting that "[t]he Code is recognized . . . in this circuit as prescribing appropriate guidelines for the professional conduct of the bar"); accord Stratavest Ltd. v. Rogers, 903 F. Supp. at 666. The Code sets forth a variety of ethical considerations, canons, and disciplinary rules to be followed by all attorneys. Under the Code, "[t]he Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action." International Union, UAW v. Nat'l Caucus of Labor Comms., 466 F. Supp. 564, 567 (S.D.N.Y. 1979) (citations omitted). While disciplinary rules are mandatory, considerations and canons are hortatory or recommended.

Although defendant has cited no law in support of its motion to disqualify, the Court's analysis begins with an examination of Canons 7 and 9 of the Code. See Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Local Civil

---

[32]The most current version of the Local Rules may be found at the web address: http://www.nyed.uscourts.gov/localrules.pdf.

Rules 1.3(a)(6); 1.5(b)(5); see also JPMorgan Chase Bank v. Liberty Mut. Ins. Co., 189 F. Supp. 2d 20, 22 (S.D.N.Y. 2002). The Code defines the ethical guidelines for members of the bar. See Cheng v. GAF Corp., 631 F.2d at 1054; Mitchell v. Metropolitan Life Ins. Co., 2002 WL 441194, at *3; International Union, UAW v. Nat'l Caucus of Labor Comm., 466 F. Supp. 564, 566 (S.D.N.Y. 1979); cf., Handelman v. Weiss, 368 F. Supp. at 263 (noting that even though the Code of Professional Responsibility had not been formally adopted by the Southern District of New York, "courts have looked to the Code primarily as an aid in [their] determination of acceptable practices").

Canon 7 requires an attorney to represent his client "within the bounds of the law," and Ethical Consideration ("EC") 7-27 explicitly states that "a lawyer should not suppress evidence that the lawyer or the client has a legal obligation to reveal or produce." Code, EC 7-27. Disciplinary Rule ("DR") 7-102(A) of the Code expressly provides that: "A lawyer shall not . . . [c]onceal or knowingly fail to disclose that which the lawyer is required by law to reveal." Code, DR 7-102(A); 22 N.Y.C.R.R. § 1200.33 (2008). The Second Circuit has noted that:

> with rare exceptions disqualification has been ordered only in essentially two kinds of cases: (1) where an attorney's conflict of interests in violation of Canons 5 and 9 of the Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client . . . or more commonly (2) where the attorney is at least potentially in a position to use privileged information concerning the other side.

Board of Educ. v. Nyquist, 590 F.2d at 1246 (internal citations omitted). Thus, it follows that motions for disqualification pursuant to Canon 7 "are to be judged cautiously and, even if found, should not trigger disqualification unless they are likely to taint the trial absent some corrective measure." Contini v. Hyundai Motor Co., No. 90 CV 3547, 1991 WL 274465, at *5 (S.D.N.Y.

Dec. 10, 1991).

Canon 9 requires a lawyer to "avoid not only professional impropriety but also the appearance of impropriety." Code, EC 9-6. In applying Canon 9, the Second Circuit has held that in all but the rarest of cases, the mere appearance of impropriety is not enough to disqualify an attorney. See Board of Educ. v. Nyquist, 590 F.2d at 1246-47; see also Flaherty v. Filardi, No. 03 CV 2167, 2004 WL 1488213, at *3 (S.D.N.Y. Jul. 1, 2004). Rather, courts should look at whether the ethical violation would taint the underlying trial. See Board of Educ. v. Nyquist, 590 F.2d at 1246-47; see also Feinberg v. Katz, No. 01 CV 2739, 2003 WL 260571, at *7-8 (S.D.N.Y. Feb. 5, 2003); Frontline Commc'ns Int'l, Inc. v. Sprint Commc'ns Co. L.P., 232 F. Supp. 2d 281, 288 (S.D.N.Y. 2002); Brooks v. Bates, No. 89 CV 4478, 1994 WL 121851, at * 4 (S.D.N.Y. Apr. 7, 1994).

### 2. Analysis

Defendant contends that disqualification of Bowens's counsel is warranted because plaintiffs' counsel made the "bald assertion that Atlantic [had] engaged in 'threats, harassment, trickery or an outright buy-off.'" (Def.'s Jan. 16, 2007 Letter at 1-2). Defendant also contends that other than the Declaration of Bowens, plaintiffs' counsel offered no support for their "scandalous assertion" that Atlantic had engaged in any wrongdoing in violation of the Court's order. (Id.) Indeed, Atlantic contends that plaintiffs' counsel should be disqualified for failing to disclose to the Court certain critical information that defendant provided regarding Mr. Marti. (Id. at 3). Among other things, defendant points to the failure of counsel to notify the Court regarding Marti's October 31, 2006 letter discharging counsel. Pointing to Mr. Gottlieb's letter dated November 3, 2006 addressed to Marti, defendant contends that even though plaintiffs'

53

counsel acknowledged Marti's discharge of his counsel and agreed to take no further action on Marti's behalf, plaintiffs' counsel never so informed the court. (Id.) Defendant further argues that plaintiffs' counsel wrongfully asserted that individuals are involved in the case but have not communicated with those individuals, thus "preventing the Court and Atlantic from hearing from them." (Def.'s Feb. 19, 2007 Letter at 2-4).

In response to defendant's motion for disqualification, plaintiffs note that defendant has failed to cite a single case in support of its motion. (See Pls.' Feb. 9, 2007 Letter at 1). Plaintiffs argue that in fact the defendant's motion "is simply the latest in [its] pattern and practice of having clients interfere with the attorney-client relationship between employees that sue them." (Id. at 2).

The Court agrees. Defendant has provided no basis on which to disqualify plaintiffs' counsel. It has not cited a single case in which the type of statements and action cited as the basis for defendant's motion have been found sufficient to justify qualification.

Accordingly, the Court respectfully recommends that the motion for disqualification be denied.


E. <u>MOTION FOR PROTECTIVE ORDER</u>

Finally, plaintiffs move for a permanent protective order to prevent defendant and its officers, agents, and employees from communicating with anyone involved in the case. (Pls.' Nov. 30, 2006 Letter at 1).

Defendant objects to the plaintiffs' request, asserting that plaintiffs have offered no legitimate basis for restraining Atlantic from discussing the case with its employees. (Def.'s Jan.

16, 2007 Letter at 4). Defendant contends that under the relevant ethical rules, it is not improper for one party to communicate with another party "'when the client conceives or initiates the conversation.'" (Id. at 2 (citing Ass'n of the Bar of the City of N.Y., Formal Op. No. 2002-3, which interpreted Disciplinary Rule 7-104)). Thus, the defendant contends that Atlantic had the right to communicate with Bowens, as well as the right to contact non-parties. (Id.) In the absence of a certified class, defendant argues that there is no legal basis to enjoin it from contacting anyone, particularly current employees. (Id. (citing the transcript of proceedings in Jaikaran v. Bedessee Imports, 06 CV 2166, at p. 18 (E.D.N.Y. June 22, 2006) (noting in an FLSA action the court's conclusion that "I don't think that lawyers and courts ought to be intruding upon an employer/employee relationship that's healthy and productive"))).

In support of their request, plaintiffs point to a Fall 2006 newsletter in which Mr. Kornstein, Atlantic's counsel, "brags about the dismissal in Jaikaran" and describes the means by which he obtained the dismissal of another class lawsuit, noting that as soon as the complaint was filed, the vice president of the defendant company "'immediately spoke to the employee and addressed his employee's underlying concerns. In return, the employee agreed to tell his class action lawyers to withdraw his claims.'" (Pls.' Feb. 9, 2007 Letter at 2, Ex. A). Plaintiffs' counsel further notes that although counsel attempts to justify this strategy by pointing to a New York City Bar Opinion, the actual Disciplinary Rule at issue adds the provision that such communications may occur "'provided the lawyer gives reasonable advance notice to the represented party's counsel.'" (Id. at 2-3 (citing D.R. 7-104), Ex. B). Plaintiffs also note that the Bar Opinion makes it clear that the lawyer should not "'assist the client inappropriately to seek confidential information or invite the nonclient to take action without the advice of counsel.'"

(Id. at 3 (citing Ass'n of the Bar of the City of N.Y., Formal Op. No. 2002-3)).

Plaintiffs further note that there is more at stake in collective and class actions (id. at 4 (citing Loatman v. Summit Bank, 174 F.R.D. 592 (D.N.J. 1997), and that by "intimidating and buying off representative plaintiffs behind their counsel's backs, defendant and Mr. Kornstein are, in effect, subverting the collective/class action mechanism and leaving absent employees at the mercy of their employer." (Id.)

Now that the Court has recommended certification of this case as a collective action, defendant's discussion with potential opt-in class members in the absence of notice to plaintiffs' counsel would be improper. Accordingly, the Court respectfully recommends that plaintiffs' request for a protective order be granted.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. Section 636(b)(1); Fed. R. Civ. P. 6(a), 6(e)), 72; Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.


**SO ORDERED.**

Dated: Brooklyn, New York
       March/4, 2008

Cheryl L. Pollak
United States Magistrate Judge